## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| BERNIE FELTMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:16-cv-01051-JEO |
| | ) | |
| BNSF RAILWAY COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This is a disability discrimination case.  Plaintiff Bernie Feltman alleges that defendant BNSF Railway Company, Inc. violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, when it withdrew an employment offer after learning that he has a partially amputated right foot.  He alleges that BNSF is liable under the ADA for discriminating against him on the basis of an actual disability and the perception of a disability.  The case is now before the court on BNSF's motion for summary judgment. (Doc.[1] 13).  The motion has been fully briefed by the parties.  Upon consideration, the motion will be granted.

---

[1] References to "Doc. __" are to the documents numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court views the evidence in the light most favorable to the non-movant. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). The court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Id.* Inferences in favor of the non-movant are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). At summary

judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## FACTS[2]

During the summer of 1974, Feltman injured his right foot in an accident on a construction site.  As a result of the accident, the toes and adjoining area of his right foot were amputated.  He has worn a prosthesis ever since.

On May 21, 2014, Feltman submitted an online application for a Conductor Trainee position with BNSF.  BNSF operates a railroad network covering the western two-thirds of the United States.  Conductors are in charge of operating the trains, which includes addressing problems that may arise during a train trip and ensuring that trains move safely and efficiently.

BNSF's Conductor Trainee application includes a "Voluntary Self-Identification of Disability" form for applicants to complete if they voluntarily choose to do so. (Doc. 15-2 at 72).  The form identifies "[m]issing limbs or partially missing limbs" as a type of disability. (*Id.* at 73).  Feltman elected not to complete the form and did not disclose his partially amputated right foot as a disability.

---

[2] Except where noted, the following facts are undisputed and are taken from BNSF's Statement of Undisputed Facts (doc. 14 at 3-18), Feltman's Response to Defendant's Statement of Facts (doc. 16 at 3-9), Feltman's Additional Undisputed Facts (doc. 16 at 9-11), and BNSF's Response to Plaintiff's Additional Undisputed Facts (doc. 18 at 5).  Consistent with the summary judgment standard, the facts have been presented in the light most favorable to Feltman, the non-movant.

After receiving Feltman's application, BNSF invited Feltman to a "job preview and interview session" held in Birmingham, Alabama, on July 2, 2014. During the job preview session, BNSF's Director of Human Resources delivered a presentation on the requirements of the Conductor position and described the hiring process for applicants who were selected for a conditional employment offer. He advised the applicants that, if selected, they would be subject to a medical review process, which includes completing a medical questionnaire and undergoing a physical capabilities test.

On July 8, 2014, BNSF conditionally offered Feltman a position in its Conductor Trainee training session beginning September 29, 2014, in Birmingham. The training session is mandatory for all BNSF Conductors and lasts up to seventeen weeks including both classroom and on-the-road training. The job description for the Conductor Trainee position includes the "basic qualifications" of "[ability] to work on uneven surfaces; frequently climb ladders and get on/off equipment; [and] work at various heights above the ground including on top of locomotives, railcars and other equipment." (Doc. 15-1 at 97). Feltman's offer was contingent on his successful completion of a "pre-employment screening consisting of … receipt and review of a completed BNSF medical questionnaire, physical examinations, hair analysis drug screen, [and] background investigation

….” (*Id.* at 95).  Feltman accepted the conditional employment offer on July 9, 2014.

The BNSF screening process commences directly after the offeree's acceptance of the conditional offer.  The process begins with the offeree's completion of an on-line medical questionnaire, which asks questions regarding the offeree's current and past medical conditions.  The purpose of the questionnaire is to identify any conditions that require further investigation to determine whether the offeree can safely perform the essential functions of the position with or without accommodation.

Feltman completed and submitted his on-line medical questionnaire on July 9, 2014.  He answered "No" to the following questions:

2.  Have you had any of the following that caused you to miss work/school for more than 2 days . . .

    a.  Illness or injury,
    b.  Hospitalization,
    c.  Surgery

20.  Have your work tasks or daily activities ever been interfered with by pain, swelling, or soreness in your . . .

    m.  Feet

22.  Do you currently or have you ever had any of the following musculoskeletal problems . . .

    a.  Weakness in any of your arms, hands, legs or feet …

(Doc. 15-1 at 101-104).  Feltman contends that he answered these questions truthfully, because the loss of his right toes in the summer of 1974 did not interfere with his daily work tasks and he did not suffer weakness in his foot as a consequence of the injury. (Doc. 16 at 5).  BNSF disagrees, and points to Feltman's admissions at his deposition that he did experience weakness in his foot following the accident and that his injury did interfere with his daily tasks that summer. (Doc. 14 at 9-10).

Feltman's medical questionnaire was reviewed by Eileen Henderson, a nurse who works for Comprehensive Health Services ("CHS"), a third-party contractor that performs initial medical reviews for BNSF.  Nurse Henderson spoke with Feltman by phone and asked him questions regarding the conditions he had identified in the questionnaire.  According to Nurse Henderson's notes from the conversation, Feltman denied having any medical or musculoskeletal issues other than the ones he had identified in the questionnaire. (Doc. 15-3 at 19).  Feltman also informed Nurse Henderson that he currently worked as a letter carrier and walked 3 miles, 3 to 5 times a week. (*Id.*)

On July 17, 2014, Feltman participated in a physical capabilities test at Thomasville Physical Therapy.  Feltman met the qualifications for strength and range of motion in his knees and shoulders.  The physical capabilities test did not include an examination of Feltman's feet.

Feltman then visited Prime Care Occupational Medicine ("Prime Care") for a medical screening exam. His vital signs, vision, hearing, and urine were all tested and were all within normal limits. The screening did not include a foot examination, although Feltman was required to remove his shoes when his weight was checked. Based on Feltman's test results, BNSF Nurse Charlene Coleman certified that he met the minimum requirements for vision and hearing under the Federal Railroad Administration regulations.[3]

On August 4, 2014, BNSF notified Feltman by email that he had "completed the necessary steps in the medical evaluation" and was "currently medically qualified" for the Conductor Trainee position. (Doc. 15-1 at 116).

On September 7, 2014, BNSF informed Feltman by email that he had "met the requirements of the pre-employment screening process for the Conductor Trainee" position in Birmingham. (Doc. 15-1 at 115). He was instructed to report on September 29, 2014, to begin his training. (*Id.*) He was also advised:

> If any information you have supplied during the application and hiring process, including medical and criminal-background information, has become inaccurate, incomplete, or otherwise has changed prior to your first day of employment, you must immediately notify BNSF via mednewhire@bnsf.com for medical information or BNSF.Newhire@bnsf.com for non-medical information and provide an explanation. Failure to do so may result in BNSF rescinding your final offer letter or terminating employment.

(*Id.*).

---

[3] 49 C.F.R. § 240.121 sets forth vision and hearing requirements for railroad conductors.

Three days after Feltman received the email informing him that he had satisfied the pre-employment screening requirements for the Conductor Trainee position, Feltman sent an email to BNSF with an attached letter "concerning [his] offer of employment with respect to [his] medical information." (Doc. 15-1 at 117). He stated in his letter:

> I was offered, and accepted, employment with BNSF as a Conductor in Birmingham, Alabama. In completing all my pre-employment documentation and my pre-employment strength and medical exams, there did not seem to be a problem or conflict. I answered all required questions with direct answers and did the same at my various exams and agility tests.
>
> Earlier today, while completing my employment documents, I came across a document that asked if I had a disability. Technically, by the strictest letter of the law, I do have a disability. However, I personally do not feel as if I am disabled. As a teenager, during summer vacation from high school, I was in an accident that resulted in me losing the toes and adjoining area of my right foot. For years, I've worn a prosthesis and have vigorously exercised and maintained a lifestyle that is far more active than the majority of non-disabled people in my age group. . . . At no time has my amputation caused me to fail to do anything that I wanted to do. Therefore, I don't consider this an issue.
>
> However, I do not want my employment to be affected either by the failure to disclose my disability or by the disclosure of my disability. If I have been deemed medically certified by the BNSF Medical Department, does any of this matter? Please give me guidance regarding this very important matter.

(*Id.* at 119).

After receiving Feltman's letter, BNSF's Director of Medical Support Services, Chris Kowalkowski, reviewed Feltman's medical questionnaire and

determined that Feltman had not disclosed his foot condition in his responses. Kowalkowski re-opened Feltman's medical review for further inquiry into his foot condition. Pursuant to BNSF policy, the medical review was sent back to CHS. CHS Nurse Henderson then contacted Feltman to set up a focused "Occupational Health Assessment" exam with Prime Care. (Doc. 15-3 at ¶ 21).

Dr. Matthew Krista conducted the focused exam on September 16, 2014. (Doc. 15-2 at 44-45). He followed the "BNSF Focused Exam" form provided by CHS and completed the attached "Musculoskeletal Exam Worksheet B (Hip, Knee, Ankle)." (*Id.*) Dr. Krista found that Feltman's range of motion in his hips, knee, and ankle was normal; that his gait was normal; and that he was able to tandem walk, walk on his heels, hop, squat, and rise from a squat. (*Id.*) Dr. Krista noted Feltman's "mid foot amputation" but concluded that Feltman had "no functional limitations with prosthesis." (*Id.*)

Following completion of the focused exam, Nurse Henderson sent Feltman's updated medical file to BNSF's Medical Officer, Dr. Ken Knight, for review. According to Dr. Knight, he had two questions that were not answered by the information in Feltman's file. First, could Feltman, with his partial foot amputation and prosthesis, perform the duties of the Conductor position requiring him to walk up to several miles on uneven surfaces and regularly climb ladders and other equipment? Second, if Feltman could perform those duties, would he need

any special footwear or other equipment to protect his foot and prosthesis? (Doc.

15-4 at ¶ 10).

By email dated September 19, 2014, BNSF requested Feltman to provide the

additional information sought by Dr. Knight, as follows:

> The BNSF Medical Review Officer has decided [a]fter review of the information your provided, additional information is needed to determine your qualification for the safety sensitive Conductor Trainee position due to possible significant health and safety risks associated with your foot condition. If you choose, you can obtain all of the following information and provide it to CHS to permit further evaluation of your health status and risks.
>
> You can provide an updated in-office evaluation by an orthopedic surgeon or podiatrist of your current functional status (supported by a physical exam), any recommended activity restrictions, treatment plan (to include pharmacological and non-pharmacological therapies) and prognosis. Please ensure this evaluation specifically addresses any special requirements for footwear as well as your ability to walk several miles per day on uneven surfaces.
>
> If you choose to supply all of the above, we can evaluate your condition again, but please note that simply providing this information does not guarantee qualification.
>
> We request that you provide the information requested as soon as possible to ensure timely review and determination of your medical qualification status. We will be unable to complete this review until we receive all of the requested information. Your conditional offer may be rescinded if you do not supply the requested information within 28 calendar days of this request AND at least 10 calendar days prior to your project start date, whichever is sooner. …

(Doc 15-1 at 134 (bold print omitted)). Feltman emailed his response to BNSF's

request for more information shortly after receiving the request:

Dr. Krista, staff physician at Prime Care …, who examined me per your request, flatly determined that I have NO limitations, period.

I work for the U.S. Postal Service and when I WALK a city route, I walk between 5-9 miles per day.

I walk 3 miles per day for exercise.

I SUCCESSFULLY PASSED the physical agility test that you required me to take.

At this point, you already have sufficient information to determine that I CAN perform the duties of conductor.

I AM going to schedule an appointment with a Podiatrist for an examination to specifically answer your questions. This is being done with knowledge that I accepted a job with BNSF with a start date of September 29, 2014. I DO NOT require accommodations to perform the requirements of the job as outlined by the Americans With Disabilities Act. I am more than a little frustrated with what you are requiring me to do to obtain employment that I've already been offered and accepted.

(Doc. 15-1 at 136-37 (capital letters in original)).

Dr. Knight responded directly to Feltman's email the morning of September 22, 2014. Dr. Knight advised Feltman that "when a specialist confirms your abilities and attests to the fact of whether we will be putting you or your co-workers at risk (or not) we will review that information." (Doc. 15-1 at 136). Dr. Knight also told Feltman: "You are correct regarding what we did previously require of you; however, those screening tests do not answer the questions that are being addressed by my most recent request." (*Id.*)

Later that same day, Feltman advised BNSF by email that, upon further review, he would not agree to any additional medical examinations: "I have been advised to refrain from seeking further medical evidence that I can perform the duties of conductor trainee." (Doc. 15-1 at 142). He explained: "I was offered conditional employment. I was medically certified. Then I was medically decertified and sent for an additional exam which clearly resulted in the physician certifying my fitness for duty …. At this point, with the way that I've been treated, there is no need to subject myself to any additional examinations." (*Id.*)

On September 24, 2014, Dr. Knight responded to Feltman's email, stating that "[t]he goal here is to make a reasonable, informed decision about whether you can safely perform the duties of the safety-sensitive Conductor Trainee position." (Doc. 15-1 at 141). Dr. Knight also clarified that Feltman had not been medically decertified: "[C]ontrary to what you wrote in your email, you have not been 'medically decertified' but put back into process. In other words, you have simply been asked, in light of the new information you recently disclosed, to provide additional, limited information to fully assess your qualification for this position." (*Id.*) Dr. Knight explained that Feltman's prior screening tests "did not answer the questions that a podiatrist or orthopedic surgeon could answer." (*Id.* at 142). He urged Feltman to reconsider his decision and advised Feltman that if he acted quickly and provided the requested information during business hours that week,

"there would still be time for us to evaluate the information and consider you for enrollment in the class that starts Monday (September 29, 2014)." (*Id.*)

Feltman emailed a response to Dr. Knight that night, stating: "Had BNSF been sincere about me making the September 29, 2014 date, then BNSF would've made arrangements for me to see a podiatrist or orthopedic surgeon. Placing the burden on me to schedule, pay for, and attend these examinations is simply another attempt to 'legally' circumvent the provisions of the ADA." (Doc. 15-1 at 141). Feltman also asserted that Eileen Henderson and Chris Kowalkowski had informed him that he was "medically decertified." (*Id.*) He claimed that he had voicemail messages from Henderson and Kowalkowski using that "specific term." (*Id.*) However, when the voicemail messages were played at his deposition, Feltman conceded that neither Henderson nor Kowalkowski had used the term "medically decertified" in their messages. (Feltman Dep. at 149-56).[4]

On Friday morning, September 26, 2014, Dr. Knight sent Feltman an email advising him that "[u]ltimately, the decision about whether to provide the additional information is yours to make. If you choose not to provide the information by the close of business today, you will then receive an email rescinding your offer for the safety sensitive position of Conductor Trainee which

---

[4] Feltman's deposition is located at Doc. 15-1 at pages 2-50. The citation is to the actual pages of the deposition.

starts on 9/29/2014 due to the inability of BNSF to complete your medical review. If you choose to provide the requested information, it will be reviewed today . . . ."

Feltman responded to Dr. Knight's email at 4:32 PM the afternoon of September 26, 2014. He reiterated that he was "fully capable of performing the duties of the [Conductor] job …." (Doc. 15-1 at 140). He advised Dr. Knight that he wanted his "medical clearance restored" and wanted to start work with his trainee class in Birmingham. (*Id.*) He concluded his email as follows:

> [A]s far as walking on ballast, walking on uneven surfaces, balance and any other concerns that BNSF may have, those are simply not relative to my injury. I've lived with this for 40 years. I know my limits and capabilities better than any "specialist" you might select to send me to. At some point somebody needs to be open minded about this matter and realize that I'm not only a viable candidate, but I'm an excellent candidate who simply has a minor issue that was overcome decades ago.

(*Id.*)

Dr. Knight sent Feltman a final email later that evening. Dr. Knight told Feltman: "I … believe it is a possibility that you could meet our criteria to be medically qualified. Unfortunately, I don't have the information that I felt was necessary to be able to make that determination. The history you give and the occupational health exam by Dr. Krista were positive, but not enough." (Doc. 15-1 at 139). Dr. Knight encouraged Feltman to re-apply if he was still interested in working for BNSF. (*Id.*)

The following day, September 27, 2014, BNSF informed Feltman that it was rescinding his contingent offer of employment due to his "fail[ure] to complete the medical process within the allotted amount of time." (Doc. 15-1 at 145).

On November 10, 2014, after the Conductor Trainee training session in Birmingham had been underway for more than a month, Feltman sent Dr. Knight an email with an attached evaluation of his foot condition by Dr. Diane Collier, a podiatrist. (Doc. 17-7). Dr. Collier determined that Feltman had no physical limitations. (*Id.*) Dr. Knight reviewed Dr. Collier's evaluation and was satisfied that it provided the additional medical information he had sought. (Doc. 15-4 at ¶ 18). He found that the evaluation weighed in favor of Feltman's ability to safely perform the duties of a Conductor. Dr. Knight encouraged Feltman to apply for the next open Conductor position, but he did not. (*Id.*)

On January 27, 2015, Feltman filed a charge of discrimination against BNSF with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on "disability/disability perception." BNSF responded to Feltman's charge, asserting that the reason Feltman was not hired as a Conductor Trainee was "because [he] repeatedly chose not to provide the information BNSF's medical officer needed to make a reasonable, informed, and individualized medical decision about whether he could safely perform the duties of the safety-sensitive Conductor Trainee position and because he chose not to apply for any other open

Conductor Trainee position thereafter." (Doc. 17-2 at 9).  BNSF did not include any of Feltman's physical examination documents with its response.

## ANALYSIS

Feltman alleges that BNSF discriminated against him on the basis of an actual or perceived disability—his partially amputated right foot.  His complaint contains two counts for violation of the ADA.  In Count One, Feltman alleges that BNSF is liable under the ADA for failing to hire him "because of [his] disability." (Doc. 1 at ¶ 26).  In Count Two, he alleges that BNSF is liable under the ADA for failing to hire him "because of [BNSF's] perception of [his] having a disability." (*Id.* at ¶ 30).  BNSF has moved for summary judgment on both counts.  BNSF argues that Feltman's claims are due to be dismissed because (1) Feltman has failed to establish a *prima facie* case of disability discrimination under the ADA and (2) even assuming Feltman has established a *prima facie* case, BNSF has articulated a legitimate, non-discriminatory reason for rescinding his employment offer and Feltman has not demonstrated that BNSF's reason was pretextual.

## A. *Prima Facie* Case

Section 102(a) of the ADA prohibits "discriminat[ion] against a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. §

12112(a).   In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff has the burden to show (1) that he is disabled; (2) that he is a qualified individual; and (3) that he was subjected to unlawful discrimination because of his disability.  *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F3d 1264, 1268 (11th Cir. 2014) (citing *Holly v. Clairson Industries, LLC*, 492 F.3d 1247, 1255-56 (11th Cir. 2007)).  Here, BNSF argues that Feltman has failed to establish a *prima facie* case of disability discrimination because (1) he does not have a "disability" under the ADA, (2) BNSF did not regard him as disabled, and (3) he has not demonstrated that his foot condition was the cause of the withdrawal of his employment offer.

## 1.    Disability

Disability is defined three ways under the ADA: (1) a physical or mental impairment that substantially limits one or more major life activities of the individual; (2) a record of such impairment; or (3) being regarded as having such an impairment.  42 U.S.C. § 12102(1); *Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004).  As noted above, Feltman alleges in his complaint that his foot impairment is a disability (Count One) and was perceived by BNSF as a disability (Count Two).  In other words, he grounds his claims on both the first and third definitions of "disability" under the ADA.

### a. Count One - Actual Disability

In order for a plaintiff to establish that he has an actual "disability" under the ADA, the plaintiff must show that he has a physical or mental impairment that "substantially limits one or more of [his] major life activities." 42 U.S.C. § 12102(1). Major life activities include (but are not limited to) caring for oneself, performing manual tasks, walking, standing, lifting, bending, and working. 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of [the ADA]." 29 C.F.R. § 1630.2(j)(1)(ii).

Here, Feltman has not demonstrated that his partially amputated right foot is an actual "disability" under the ADA, because he has not shown that his foot condition limits any of his major life activities. Indeed, when questioned about his disability at his deposition, Feltman testified as follows:

> Q. What is [your] disability?
>
> A. Partial – partial amputation of the right foot.
>
> Q. How does that condition currently limit your daily life activities?
>
> A. It doesn't.
>
> Q. So it doesn't in any way?

|   |   |
|---|---|
| A. | No. |
| Q. | If you did not have the prosthesis, how would it impact your daily activities, if you can answer? |
| A. | It – it wouldn't.  I could do the same things. |
| Q. | Without the prosthesis you can still do the same thing[s]? |
| A. | Correct. |

(Feltman Dep. at 173-74).  Consistent with this testimony, Feltman stated in his initial letter notifying BNSF of his foot condition that "[a]t no time" had his partial amputation caused him "to fail to do anything that [he] wanted to do." (Doc. 15-1 at 119).  In subsequent correspondence he characterized his foot condition as a "minor issue that was overcome decades ago." (Doc. 15-1 at 140).  In addition, Dr. Krista, who performed Feltman's "focused exam," found that Feltman had "no functional limitations with prosthesis." (Doc. 15-2 at 44).

An impairment that does not substantially limit a major life activity does not satisfy the first definition of "disability" under the ADA.  Accordingly, because Feltman has not shown—and in fact has expressly denied—that his partial foot amputation limits any of his daily life activities, he does not have an actual disability under the ADA, and he cannot establish a *prima facie* case of disability discrimination under Count One of his complaint.[5]  *See, e.g., Cooper v. CLP*

---

[5] In Feltman's response to BNSF's motion for summary judgment, he does not respond directly to BNSF's argument that he does not have an actual "disability" under the ADA.  Instead,

*Corp.*, 2015 WL 9311964, *4 (N. D. Ala. Dec. 23, 2015) (finding that the plaintiff's "lazy eye" condition was not a disability under the ADA, where the plaintiff testified that the condition did not limit him in any substantial way); *Ingles v. Neiman Marcus Group*, 974 F. Supp. 996, 1002-03 (S.D. Tex. 1997) (finding that the plaintiff's partial foot amputation was not a disability under the ADA, where the impairment did not substantially limit his ability to walk and he was "capable of tending to his normal, daily activities").

### b.    Count Two – "Regarded as" Disabled

Until 2009, "the ADA required a plaintiff alleging a 'regarded as' disability claim to prove that [his] perceived impairment 'substantially limited a major life activity.'" *Nevitt v. U.S. Steel Corp.*, 18 F. Supp. 3d 1322, 1328 n.4 (N.D. Ala. 2014) (citing 42 U.S.C. § 12102(2) (2008)). However, the ADA Amendments Act of 2008 (the "ADAAA"), Pub. L. No. 110-235, 122 Stat. 3553, "explicitly

---

Feltman argues that he has a "record of" disability as defined by the ADA. (Doc. 16 at 14-16). This contention is not alleged anywhere in his complaint. Nowhere in his complaint does Feltman allege that BNSF discriminated against him because he has a "record of" disability. Therefore, the court will not consider this argument, because a plaintiff may not raise a new legal claim in response to a motion for summary judgment. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1313 (11th Cir. 2004). Moreover, even if the court were to consider Feltman's argument that BNSF discriminated against him based on a "record of" disability, his claim would still fail, because the "record of" disability standard is satisfied only if the plaintiff "actually suffered a physical impairment that substantially limited one or more of [his] major life activities." *Hilburn v. Murata Elec N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999). As discussed above, Feltman has not shown that his foot impairment substantially limits any of his major life activities.

eliminated the 'substantial limitation' requirement for 'regarded as' claims."[6] *Id.* As amended, the ADA now provides that an individual will be "regarded as" disabled if the individual establishes that "he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). "Because of [the ADAAA], a plaintiff need demonstrate only that the employer regarded him as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity." *Wolfe v. Postmaster General*, 488 F. App'x 465, 468 (11th Cir. 2012).

Applying this standard to the present case, the court is satisfied that Feltman has made a sufficient showing that BNSF regarded him as disabled. BNSF clearly regarded Feltman as having an impairment, because once it learned that he had a partially amputated foot, it re-opened his medical review and sought additional information to determine whether he could safely perform the essential functions of the Conductor position. Prior to that, BNSF had determined that Feltman was "medically qualified" for the position. It was only upon learning about Feltman's foot condition that BNSF questioned his physical ability to perform the job safely.

---

[6] The ADAAA did not, however, affect the elements of a plaintiff's *prima facie* case. *Howze v. Jefferson Cnty. Comm. for Econ. Opportunity*, 2012 WL 3775871, *10 (N.D. Ala. Aug. 28, 2012).

Even after Dr. Krista's "focused exam" found that Feltman had "no functional limitations with prosthesis," BNSF (Dr. Knight) still was not satisfied, without a further evaluation by a specialist, that Feltman could perform the duties of the Conductor position requiring him to walk several miles on uneven surfaces and climb ladders and other equipment. BNSF may or may not have believed that Feltman's foot condition prevented him from performing a major life activity, but it certainly regarded his foot condition as an impairment, which is all that is required to satisfy the "regarded as" disability standard.

### 2. Causation

Although the court is satisfied that Feltman has established that BNSF regarded him as disabled, that issue is not dispositive. Regardless of whether BNSF did or did not regard Feltman's foot condition as a disability, the court agrees with BNSF that Feltman has not established the third element of his *prima facie* case—that BNSF discriminated against him "because of" his foot condition. Specifically, Feltman has not established that BNSF rescinded his employment offer because of his foot condition, even assuming that BNSF perceived the condition to be a disability.

On September 27, 2014, BNSF informed Feltman that it was rescinding his employment offer because he had "fail[ed] to complete the medical process within the allotted time," not because he had a partially amputated right foot. (Doc. 15-1

at 145).  It is undisputed that Feltman failed to provide—and in fact refused to provide—the additional medical information requested by BNSF, and even Feltman admits that the reason BNSF withdrew his job offer was his failure to provide the information in a timely manner:

> Q.  Now, ultimately you were not hired because you did not provide the additional information from the podiatrist or orthopedist; correct?
> …
>
> A.  I was not hired because I couldn't do it by September the 29th – well, actually September the 25th, the close of business on September the 25th.
>
> Q.  Okay. So your offer was rescinded because you didn't provide that information by the close of business on the 26th, I believe.
>
> A.  The Friday before the Monday –
>
> Q.  Yeah.
>
> A.  -- whatever the date was, I agree with that.
>
> Q.  That was the reason you were not hired?
>
> A.  I agree with that.

(Feltman Dep. at 177-78).  Because Feltman admits that BNSF rescinded his employment offer because he failed to comply with BNSF's request for a specialist opinion on his foot condition, and not because of the foot condition itself, he

cannot establish the "causation" element of his *prima facie* case under the ADA.[7]

He cannot demonstrate that BNSF failed to hire him "because of" a disability. *See Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016) ("[T]o prove causation under the ADA, plaintiffs must show that they were not hired because of their disabilities, not because of a delay in medical clearance, even if that delay was caused by their disabilities."). Accordingly, his ADA claims fail as a matter of law.

## B.    Pretext

BNSF also argues that, even assuming Feltman has established a *prima facie* case, his ADA claims still fail because he has not demonstrated that BNSF's legitimate, non-discriminatory reason for rescinding his employment offer was pretextual. The court agrees with BNSF.

When the defendant articulates a legitimate, non-discriminatory reason for its action, the plaintiff must prove that the legitimate reason offered by the employer was not its true reason, but rather was a pretext for discrimination. *See*

---

[7] The court notes that although Feltman insists that a further examination of his foot condition by a podiatrist or orthopedic surgeon was not necessary, he has not alleged that BNSF's request for such an examination was unlawful under the ADA and has not brought a claim against BNSF for making an improper medical inquiry. Indeed, "EEOC guidance expressly provides that an employer may request 'more medical information . . . if the follow-up examinations or questions are medically related to the previously obtained medical information.'" *McDonald v. Webasto Roof Sys., Inc.*, 570 F. App'x 474, 476 (6th Cir. June 25, 2014) (quoting *ADA Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations* at 19, http://www.eeoc.gov/policy/docs/medfin5.pdf); *see also Flores v. American Airlines, Inc.*, 184 F. Supp. 2d 1287, 1294 (S.D. Fla. 2002) ("Nothing in the ADA prohibits an employer from seeking additional medical information.").

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981). As

discussed above, BNSF asserts that it rescinded Feltman's employment offer

because he refused to provide the additional medical information requested by Dr.

Knight—an evaluation from a podiatrist or an orthopedic surgeon regarding

Feltman's ability to perform the essential functions of the Conductor position.

This constitutes a legitimate, non-discriminatory reason for BNSF's action. *See*

*Dukes v. Shinseki*, 671 F. Supp. 2d 106, 112-13 (D.D.C. 2009) (granting summary

judgment for the employer where the plaintiff failed to demonstrate that the

employer's reason for rescinding her offer—that she refused to provided requested

information beyond the standard post-offer medical form—was pretextual); *Lyons*

*v. Miami-Dade Cnty.*, 791 F. Supp. 2d 1221, 1227 (S.D. Fla. 2011) (employer had

a legitimate, non-discriminatory, non-pretextual reason for terminating an

employee who refused to provide records requested by a physician during a

fitness-for-duty exam); *Graham v. Boehringer Ingelheim Pharmaceuticals, Inc.*,

451 F. Supp. 2d 360, 371-72 (D. Conn. 2006) (employer had a legitimate, non-

discriminatory, non-pretextual reason for terminating a plaintiff for failing to

complete the treatment process demanded by a physician in a fitness-for-duty

examination).

     Feltman has not offered any evidence that Dr. Knight did not actually

believe that a specialist evaluation would help him determine whether Feltman

could safely perform the essential functions of the Conductor position.[8]  On the contrary, Feltman testified at his deposition that he did not have any reason to believe that Dr. Knight's stated reasons for seeking the additional information were false.  (Feltman Dep. at 148).  Feltman has also failed to offer any evidence that he would not have been allowed to participate in the Conductor Trainee class if he had provided a specialist evaluation confirming that he could perform the essential functions of the job safely.  In short, he has failed to demonstrate that BNSF's legitimate, non-discriminatory reason for rescinding his employment offer was a pretext for discrimination.

In his response to BNSF's motion for summary judgment, Feltman argues that a reasonable jury could determine that BNSF's stated reason is pretextual because BNSF has "shifted its legitimate non-discriminatory reason for revoking [his] job offer." (Doc. 16 at 27).  He asserts:

> … [BNSF's] brief states its "legitimate non-discriminatory reason for withdrawal" of "Feltman's offer [was] because he refused to provide an evaluation from a specialist (podiatrist or orthopedic surgeon) regarding his ability to perform particular required aspects of the Conductor position."  But when responding to the EEOC, [BNSF] gave a very different answer.  In its position statement, [BNSF] informed the EEOC that "Mr. Feltman did not disclose his amputation and prosthetic device on the written medical questionnaire or in response to a nurse's inquiry.  He then refused to provide the medical information requested in a timely manner, such that he chose not [to] complete the medical review process in time for the scheduled start for the Conductor Trainee class."

---

[8] The court notes that Feltman elected not to depose Dr. Knight.

(*Id.* at 28) (emphasis in original, record citations omitted). The court rejects Feltman's premise that BNSF has "shifted" its articulated reason for withdrawing Feltman's employment offer. BNSF's statement in its summary judgment brief that Feltman's offer was withdrawn because he "refused to provide an evaluation from a specialist" is entirely consistent with its statement to the EEOC that Feltman "refused to provide the medical information requested in a timely manner." The two statements are functionally equivalent.

Feltman also argues that pretext can be found in BNSF's submission of "incomplete and misleading information to the EEOC[.]" (Doc. 16 at 29). The crux of his argument is that BNSF "withheld" documents showing that he cooperated in BNSF's medical review process and was deemed medically qualified for the Conductor Trainee position, including his "pre-employment/clinical examination documents" as well as Dr. Krista's "focused exam" form finding that he has "no functional limitations with prosthesis." (*Id.* at 29-32). Feltman argues that BNSF's failure to submit these documents to the EEOC provides sufficient evidence for a jury to determine that BNSF's alleged non-discriminatory reason for not hiring him—his failure to provide an evaluation from a specialist—is a pretext for disability discrimination. (*Id.* at 32).

The court is not persuaded by Feltman's argument. Tellingly, Feltman has not cited a single case finding pretext based on an employer's decision not to

include certain documents as part of its response to an EEOC charge, especially where, as here, the employer's position statement is consistent with the employer's articulated non-discriminatory reason for its employment action. Feltman has not shown that anything BNSF did or did not provide to the EEOC is inconsistent with BNSF's position that it rescinded Feltman's job offer because Dr. Knight wanted a specialist to examine Feltman's foot condition and Feltman refused to undergo such an exam. Feltman may have believed that a specialist exam was unnecessary, but he has offered no evidence that Dr. Knight's explanation for why he wanted the exam was a pretext for discrimination.

Lastly, the court notes that elsewhere in Feltman's response he argues that a reasonable jury could conclude that BNSF "would test [him] continually until a doctor found him not suitable to perform the function of the Conductor Trainee position." (Doc. 16 at 24, n.15). Although this is not a pretext argument *per se*, it does embody Feltman's overarching contention that BNSF did not want to hire an employee with an amputation and that its true motive for wanting him to undergo further examination by a specialist was to find a way to disqualify him. The problem with this argument—indeed, the central problem with Feltman's case as a whole—is that it is entirely speculative. Because Feltman refused to be examined by a specialist, it is pure speculation on his part that BNSF would not have accepted the results of a favorable examination and would instead have demanded

more and more testing until an unfavorable determination was made. He is asking the court to infer that BNSF would not have hired him even if he obtained a favorable opinion from a specialist, but that inference is based on speculation and conjecture and not on any evidence. An inference that is not based on the evidence is not reasonable and is not sufficient to create a genuine issue of material fact as to pretext. *See Wilbourne v. Forsyth Cnty. Sch. Dist.*, 306 F. App'x 473, 476 (11th Cir. 2009) ("Where a defendant offers extensive evidence of legitimate, nondiscriminatory reasons for its actions, conclusory allegations by the plaintiff are insufficient to raise an inference of pretext." (citing *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996)); *see generally Daniels*, 692 F.2d at 1324 ("[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation").

Feltman has failed to establish that BNSF's legitimate, non-discriminatory reason for rescinding his employment offer was a pretext for discrimination. Accordingly, even assuming that Feltman has established a *prima facie* case of discrimination, his ADA claims fail as a matter of law.

## CONCLUSION

Based on the above, BNSF's motion for summary judgment (doc. 13) is due to be **GRANTED**. A separate order consistent with this opinion will be entered.

**DATED**, this 24th day of January, 2018.

_John E. Ott_

_____

**JOHN E. OTT**
Chief United States Magistrate Judge